11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Carl D. Landon 

Appellant

Vs.                   No.
11-00-00249-CV  --  Appeal from Dallas County

S&H Marketing Group, Inc.
and 

Direct Merchandising, Inc.

Appellees

 

This
appeal involves disputes dating back several years between some affiliated
corporations and their former president. 
Carl D. Landon is the former president of S&H Marketing Group, Inc.
(S&H), and Direct Merchandising, Inc. (DMI).  S&H and DMI were direct mail marketing businesses affiliated
by common ownership operating out of the same facility located in Dallas.  S&H and 
DMI were acquired in 1984 by Hamilton Farrar Richardson, a New York
investor.  Richardson formed NCF, Inc.
(NCF) as a holding company to purchase S&H and DMI.   As a result of the purchase, NCF owned all
of the stock of S&H and DMI. 
Richardson owned the majority of the stock of NCF. 

Landon was
an employee of S&H and DMI at the time of the 1984 purchase.  He 
served as the president of S&H and DMI  from 1987 to 1996.  He
also served on the board of directors of S&H and DMI during this period.[1]  From 1987 until  January 1995, Richardson and Landon were the only directors of
S&H and DMI.   Landon controlled the
companies= day-to-day operations during this
period.  Richardson described his role
as that of a passive investor.  The
record reflects that Richardson rarely traveled to Dallas to oversee  the companies and that he had placed control
of the companies in Landon=s hands.   








Harvey J.
Lippman and Michael Joseph Sullivan, two associates working in Richardson=s New York office, became involved with the
companies in 1994 at Richardson=s request.  Richardson sought
their involvement because of his concern over the companies= declining revenue.  Lippman and Sullivan initially served as consultants to
Richardson with respect to the companies= operations.  They became
directors of the companies in January of 1995.   As of January 1996, Lippman had become active in participating
in the day-to-day operations of the companies.   Lippman, Sullivan, and Richardson eventually grew dissatisfied
with Landon=s performance as president of the
companies.  They ultimately decided to
terminate Landon in April 1996. Lippman subsequently obtained ownership of
S&H and DMI after he foreclosed upon the stock of the companies.  The companies= stock had been pledged as security to him for a loan that he made to
NCF in 1992.  

Landon
initiated this litigation in July 1996 by filing suit against Lippman, S&H,
and DMI  to collect on a $100,000.00
loan that he had purportedly made to the companies in 1995.  Landon also sought damages for personal
property that he asserted had been converted by Lippman and the companies.  Landon additionally sought reimbursement for
expenses which he alleged had been incurred on behalf of the companies.  S&H and DMI filed a counterclaim against
Landon in September 1996 which sought to set aside several transactions between
Landon and the companies dating back to 1986 on the basis that Landon had
breached his fiduciary duty as an officer and director of the companies.[2]  Most of the challenged transactions
concerned situations wherein Landon was personally involved on both sides of a
particular transaction in both his individual capacity and in his capacity as
an officer and director of the companies. 
For example, S&H and DMI challenged bonuses of several thousand
dollars paid by Landon as the president of the companies to himself.  S&H and DMI also asserted that Landon
had inappropriately usurped corporate opportunities for his own personal
benefit.  

The
parties tried the matter to the trial court over several non-consecutive
days.   Neither side was entirely
successful in prosecuting their claims for affirmative relief.  Both sides have appealed the trial court=s judgment. 
We modify the trial court=s judgment in part, affirm in part, reverse and render in part, and
reverse and remand in part.

                                         The
Duty Owed by a Corporate Officer/Director








We begin
our analysis by discussing the duty owed by a corporate officer/director to the
corporation.  The Texas Supreme Court in
International Bankers Life Insurance Company v. Holloway, 368 S.W.2d 567
(Tex.1963), noted that corporate officers and directors owe a strict fiduciary
obligation to their corporation.   Three
broad duties stem from the fiduciary status of corporate officers and
directors:  namely the duties of
obedience, loyalty, and due care. 
Gearhart Industries, Inc. v. Smith International, Inc., 741 F.2d 707,
719 (5th Cir. 1984)(addressing Texas law); see General Dynamics v. Torres, 915
S.W.2d 45, 49 (Tex.App. - El Paso 1995, writ den=d).  This case concerns the duty
of loyalty which Landon owed to the corporations.  The duty of loyalty 
dictates that a corporate officer or director must act in good faith and
must not allow his or her  personal
interest to prevail over the interest of the corporation.  The duty of loyalty requires an extreme
measure of candor, unselfishness, and good faith on the part of the officer or
director.  International Bankers Life
Insurance Company v. Holloway, supra at 577. 
Under common law, contracts between a corporation and its officers or
directors are voidable for unfairness and fraud.  International Bankers Life Insurance Company v. Holloway, supra
at 576.  A corporate fiduciary is under
an obligation not to usurp corporate opportunities for personal gain.  Transactions in which a corporate fiduciary
derives personal profit are subject to the closest examination.  International Bankers Life Insurance Company
v. Holloway, supra at 577.

Whether an
officer or director is Ainterested@ with
respect to a particular transaction is a question of fact.   International Bankers Life Insurance
Company v. Holloway, supra at 577; Gearhart Industries, Inc. v. Smith
International, Inc., supra at 719.  An
officer or director is considered Ainterested@ if
he:   (1) makes a personal profit from a
transaction by dealing with the corporation or usurps a corporate opportunity;
(2) buys or sells assets of a corporation; (3) transacts business in his
officer=s or director=s capacity with a second corporation of which he is also an officer or
director or is significantly financially associated; or (4) transacts business
in his officer=s or director=s capacity with a family member. 
Gearhart Industries, Inc. v. Smith International, Inc., supra at 719-20.
 The burden of proof is on the
interested officer or director to show that the action under consideration is
fair to the corporation.  International
Bankers Life Insurance Company v. Holloway, supra at 576; Gearhart Industries,
Inc. v. Smith International, Inc., supra at 720. 

 

 








 

                                                      AInterested Director@ Legislation

It should
be noted that the Texas Legislature has enacted legislation with respect to
interested director transactions.  TEX.
BUS. CORP. ACT ANN. art. 2.35-1 (Vernon Supp. 2002) provides three methods
whereby an interested director=s contract or transaction can be validated:

1.  Upon the affirmative, good faith vote of a
majority of disinterested directors provided that the material facts of the
contract or transaction is  disclosed to
or known by the board;

 

2.  Upon the affirmative, good faith vote of the
shareholders provided that the material facts of the contract or transaction is
disclosed to or known by the shareholders; or

 

3.  The contract or transaction is fair as to
the corporation as of the time that it is authorized, approved, or ratified by
the board of directors or shareholders.

 

It appears that this
statute alters common law with respect to the requirement that the director
prove that the contract or transaction is fair to the corporation for every
challenged transaction.  Only one of the
validation methods listed in the statute requires a showing of fairness.  The other two methods - disinterested
director approval and shareholder approval - do not explicitly require a
showing of fairness.  The statute lists
the three validation methods disjunctively. 
Furthermore, the statute explicitly states that compliance with any one
of the methods is sufficient.   With
these principles in mind, we address the contracts and transactions which have
been challenged in this proceeding.

                                                                        Bonuses

The trial
court=s findings of fact regarding the bonuses
which Landon received from the companies state as follows:

Between
1987 and 1992, Landon received bonuses from NCF, Inc., S&H, and [Response
Marketing, Inc.[3]].  The following bonuses

 

$80,000           8/14/86








$150,000         1/12/89

$275,000         7/17/89

$100,000       12/17/90

 

were reported in various
companies= audited or unaudited financial statements
and/or consolidated tax returns of NCF, Inc. 
Mr. Richardson as director and majority shareholder of NCF, Inc. knew or
should have known of Landon=s actions.  Furthermore, Landon=s bonuses were authorized by Mr.
Richardson.  Landon did not breach his
fiduciary duty as it relates to these bonuses and any claims against Landon
regarding these bonuses are barred by the applicable Statute of Limitations.

 

The
$40,000 bonus paid by RMI in March of 1992, however, was not authorized or
ratified.  Furthermore, Mr. Richardson
did not know or ever had reason to know of the payment.  Landon is liable to DMI (RMI assigned its
claim) for the $40,000.

 

Thus,
with the exception of the $40,000.00 bonus paid by RMI in March of 1992, the
trial court found that S&H and DMI=s claims regarding bonuses were barred by the applicable statute of
limitations.  Furthermore, the trial
court denied S&H and DMI=s claim that Landon breached his fiduciary duty in receiving these
bonuses.

S&H and DMI attack the trial court=s finding regarding the expiration of the statute of limitations as to
the bonuses in their Appellate Issue No. 12(a).  They assert that the trial court 
erred in denying their claims on limitation grounds based on the finding
that Richardson knew or should have known of these payments to Landon.  Citing Willis v. Maverick, 760 S.W.2d 642,
646 (Tex.1988), S&H and DMI argue that their causes of action concerning
the bonuses constituted  claims for
breach of fiduciary duty which did not accrue until there had been full
disclosure by Landon of the bonuses. 
They contend that Landon fraudulently concealed the bonuses that he had
received and that the applicable limitation periods were, therefore, tolled.  








The
supreme court held in Willis that the discovery rule applies to legal
malpractice cases.  The court determined
that the statute of limitations does not begin to run until the claimant
discovers or should have discovered through the exercise of reasonable care and
diligence the facts establishing the elements of his cause of action.  Little v. Smith, 943 S.W.2d 414, 420
(Tex.1997)(ASimilarly, when there has been a breach of
fiduciary duty, the statute of limitations does not begin to run until the
claimant knew or should have known of facts that in the exercise of reasonable
diligence would have led to the discovery of the wrongful act.@)  








The trial
court made a finding which comports with the Aknew or should have known@ framework adopted by the supreme court.  S&H and DMI are essentially attacking the sufficiency of the
evidence supporting this finding.  The standards
that apply to a review of jury findings also apply to findings made by the
trial court after a bench trial. 
Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex.1994).  As
claimants, S&H and DMI had the burden of pleading and proving facts
suspending the operation of the statute of limitations.  See Willis v. Maverick, supra at 647.  When a party attacks the legal sufficiency of an
adverse finding on an issue on which he has the burden of proof, he must
demonstrate on appeal that the evidence establishes, as a matter of law, all
vital facts in support of the issue. 
Dow Chemical Company v. Francis, 46 S.W.3d 237, 241 (Tex.2001).[4]  To review the
legal sufficiency of the evidence, the appellate court must consider all the
evidence in the light most favorable to the prevailing party and must indulge
every reasonable inference in favor of the prevailing party.  Associated Indemnity Corporation v. CAT
Contracting, Inc., 964 S.W.2d 276, 285-86 (Tex.1998); Merrell Dow
Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997), cert. den=d, 523 U.S. 1119
(1998);  Harbin v. Seale, 461 S.W.2d
591, 592 (Tex.1970).   

In order to determine if the evidence is factually
sufficient, we must review all of the evidence and determine whether the
challenged finding is so against the great weight and preponderance of the
evidence as to be manifestly unjust. 
Pool v. Ford Motor Company, 715 S.W.2d 629 (Tex.1986).  

We find
that the trial court=s Aknew or should have known@ finding was supported by both legal and
factually sufficient evidence.  Landon
testified that he obtained Richardson=s oral authorization for each of the bonuses.  It was within the province of the trial court to accept this  testimony as being credible.  Moreover, excerpts from a deposition taken
in March 1993 of Richardson in another lawsuit were admitted into
evidence.  The deposition was taken by a
creditor of the companies who was seeking information from Richardson regarding
the companies= finances. 
Richardson was asked several questions concerning Landon=s compensation during the deposition,
including bonuses that he had received. 
Richardson=s
responses to these questions indicated his awareness in 1993 that Landon had
received large bonuses from the companies:

Q:  How much does [Landon] get paid, do you
know?

 

A:  I do not know the exact amount at this time,
no.  It=s over a $100,000 a year.

 

Q:  Over [$200,000]?

 

A:  No.

 

Q:  No?

 

A:  No. 
Again, I do not think over [$200,000] in salary.  In some years there have [been] bonuses I=m sure that have been over [$200,000].  To the best of my knowledge, the salary of
[Landon] is not over $200,000 a year. 
Occasionally there have been bonuses granted at different times where
the total amount of compensation would be over $200,000Bover 200,000.

 

                                                           *    *   
*

 

Q:  Would it be a fair statement then the
company could not afford to bonus Mr. Landon $130,000 in the month of June
1992?

 








A:  If the company paid him a bonus of $130,000
in June of 1992, I presume we could afford to do it and it was deserved.  

 

                                                           *    *   
*

 

Q:  Do you know whether Mr. Landon got a bonus
in June of 1992?

 

A:  I=m sure I knew at the time that Mr. Landon got a bonus, yes....Again,
Mr. Landon runs the company and he has my confidence.  Mr. Landon signs all the checks....If you=re telling me that the checks were written
and was written as a bonus then, yes, I am comfortable that he does it.
[Landon]Band I told you previously, [Landon] runs the
business.  We talk on the phone
sometimes three or four times a week, sometimes once a week, sometimes we=re notBperhaps three weeks.  And the
decisions of running the business are [Landon=s]....Before paying himself a bonus, I am confident that Mr. Landon
would discuss it with me.

 

At a
minimum, the matters covered in Richardson=s deposition constituted a sufficient disclosure of facts that, in the
exercise of reasonable diligence, would have led him, as a director, to the
discovery of any breaches of fiduciary duty allegedly perpetrated by Landon
with respect to receiving bonuses. 
Notice to an officer or agent is notice to corporation in the
circumstance where the officer or agent in the line of his duty ought, and
reasonably be expected, to act upon or communicate the knowledge to the
corporation.  International Bankers Life
Insurance Company v. Holloway, supra at 577. 
Notice to a corporation sufficient to activate the statute of
limitations is not categorically limited to that acquired by directors in
official meetings.  Id.  As noted by the supreme court in Holloway:

The office of a corporation director or
officer is more than nominal, and those assuming the duties and responsibilities
of such offices are not justified in neglecting every precaution or
investigation; it is their minimal duty and responsibility to protect the
corporation against acts adverse to the interest of the corporation, whether
perpetrated by fellow directors or by strangers. 

 

International
Bankers Life Insurance Company v. Holloway, supra at 580.  Accordingly, S&H and DMI=s Appellate Issue No. 12(a) is overruled.[5]    








S&H
and DMI=s Appellate Issues Nos. 7(a) through 7(e)
attack the legal and factual sufficiency of the evidence regarding the trial
court=s failure to award a recovery of each of the
bonuses  purportedly received by
Landon.  The trial court=s finding that S&H and DMI=s claims for these recoveries was barred by
the applicable statute of limitations is dispositive of S&H and DMI=s bonus claims.  We, therefore, do not address Appellate Issues Nos. 7(a) through
7(e) because they are moot.  TEX.R.APP.P.
47.1.

Landon
attacks the trial court=s award of a recovery to DMI for the $40,000.00 bonus he received in
1992 from RMI.  The trial court found
that this bonus was neither authorized nor ratified.  Landon essentially attacks the factual sufficiency of the
evidence regarding this finding in his Appellate Issue No. 2 by arguing that
evidence of authorization was offered at trial.   We would first note that Landon bore the burden of proof with
regard to the issue of authorization because his receipt of the bonus
constituted an interested director/officer transaction.  See Gearhart Industries, Inc. v. Smith International,
Inc., supra at 719-20.  We find ample
evidence in the record which supports the trial court=s refusal to find authorization for this
bonus.  Richardson testified that he did
not recall approving this bonus.  Landon
prepared an internal document entitled Aauthorization for payment by check@ for the $40,000.00 bonus.  This
document indicated that only Landon had approved the payment.  The Aauthorization for payment by check@ forms which Landon prepared for the other bonuses indicated that
Richardson had approved the payment. 
Additionally, Landon stated in his answer to an interrogatory propounded
by the Internal Revenue Service in 1995 that RMI had not paid compensation to
any officer, director, or shareholder since its inception.  This answer constitutes evidence of
non-disclosure and, hence, non-authorization of the $40,000.00 bonus.   Landon=s Appellate Issue No. 2 is overruled. 


                                                             Grand
Prairie Property








In 1985,
DMI purchased a tract of land in Grand Prairie for $715,000.00 for the purpose
of future relocation of the companies= facilities.  The tract was
never used for relocation.  As of 1989,
the value of the tract had decreased significantly.  Landon suggested to Richardson that the land could be sold for a
loss to offset a large taxable capital gain which NCF had realized on a sale of
corporate stock.  Landon purchased the
land in his individual capacity for a price of $300,000.00.  He made a down payment of $25,000.00, and he
executed a real estate lien note in favor of DMI in the amount of
$275,000.00.  Landon only made two
subsequent payments on the note.  In
1993, he forwarded a modification agreement to Richardson and Lippman[6]
which would have removed Landon=s personal liability for the real estate lien note by allowing him to
tender the tract back to DMI in full satisfaction of the note.  Landon requested that Richardson and Lippman
execute the modification agreement, but they refused.  Landon replaced the space for Richardson=s and Lippman=s signatures on the modification agreement with a place for his own
signature.   Landon then executed the
modification agreement as the president of DMI.

DMI began
efforts to collect the real estate lien note against Landon in 1996.  DMI 
instituted foreclosure proceedings against the property when Landon did
not pay the deficiency on the note.  DMI
alleged a deficiency in the amount of $497,027.11 (exclusive of attorneys= fees) on the note at the time it was
presented to DMI=s attorneys for collection.  Landon purchased the property at the
foreclosure sale for the price of $408,500.00. 
He subsequently sold the property for approximately $475,000.00.   The trial court awarded judgment to DMI for
$36,585.40 with respect to the Grand Prairie property based on the following
fact finding:

Landon
purchased a piece of property in Grand Prairie from DMI for $275,000 and signed
a real estate lien note.  On November
15, 1993, Landon and DMI entered into an agreement removing Landon=s personal liability under the real estate
lien note.  Under the terms of the real
estate note, Mr. Landon was to execute a deed in lieu of foreclosure and DMI
was to look solely to the property to pay the debt.  Mr. Landon sold the property for over $470,000 and has paid
$408,500 to DMI.  Mr. Landon owes DMI
the difference between the actual sales price and the $408,500.

 








S&H
and DMI=s Appellate Issue No. 1 attacks the legal and
factual sufficiency of the evidence to support the trial court=s finding of a valid modification of the real
estate lien note.  Landon executed the
modification agreement referenced above on November 15, 1993.  The trial court, therefore, determined that
Landon=s execution of the modification agreement
bound DMI to its terms.  The real estate
lien note which Landon executed in 1989 did not eliminate Landon=s personal liability for the debt.  Despite this omission, Landon contends that
an oral agreement existed between he and Richardson to the effect that Landon
would not be personally liable for the note. 
Landon, therefore, argues that the modification agreement was authorized
because it memorialized the terms of his original agreement with Richardson.  He further contends that the modification
agreement was fair to DMI based on the fairness of the original agreement.  

The trial
court=s findings of fact regarding the modification
agreement did not address any of the elements of Article 2.35-1 of the Texas
Business Corporation Act.[7]  S&H and DMI filed requests for
additional findings of fact pertaining to the elements of Article 2.35-1.  However, the appellate record does not
indicate that any additional findings were made.  The trial court did not make a finding of fairness with respect
to any of the challenged transactions. 
The only finding regarding authorization made by the trial court
concerned its finding that the $40,000.00 bonus which Landon received from RMI
in 1992 was not authorized.  Even if one
assumes that the trial court made an implied finding of authorization or
fairness, we do not find sufficient evidence to support the determination that
the modification agreement was valid.

With
respect to authorization, there is no dispute that Richardson and Lippman
refused to execute the modification agreement.   Landon overcame this obstacle by changing the signature lines on
the document and by executing the agreement himself in his corporate
capacity.  As for Landon=s theory that the modification agreement only
reflected the alleged original agreement that he not be personally liable on
the note, the trial court did not make this finding.  Moreover, even for a determination of fairness to be made under
Article 2.35-1(A)(3), approval by the board of directors or shareholders is
required.   While evidence of the
fairness of the original conveyance to Landon was offered, there is no evidence
of fairness pertaining to the execution of the modification agreement.  The modification agreement reduced the sums
to which DMI would be entitled to collect on the note without any corresponding
consideration flowing to DMI for the reduction.  








We,
therefore, sustain S&H and DMI=s Appellate Issue No. 1.  The
trial court=s determination that the modification
agreement was valid is reversed and rendered in favor of DMI.  DMI=s claim against Landon on the real estate lien note is remanded to the
trial court for determination of Landon=s liability and DMI=s corresponding damages.  We
would note in this regard that the trial court has not made a determination as
to the amount of the deficiency remaining on the note. We do not address
S&H and DMI=s Appellate Issues Nos. 2 and 3 complaining
of the damages awarded by the trial court to DMI because the award has been
remanded for determination consistent with our opinion.  We also do not address Landon=s Appellate Issue No. 3 because it attacks
the damage award made by the trial court which we are remanding.

                                                             United
Medicorp Note

S&H
and DMI=s Appellate Issues Nos. 4, 5, and 6 attack
the trial court=s denial of their claim involving a
$70,000.00 loan made to Landon.  The
trial court=s findings of fact on this claim are as
follows:  

On
December 1, 1989 Landon borrowed $70,000 from DMI for the purpose of buying
shares of United Medicorp, Inc. stock and signed a promissory note to DMI for
$70,000.  The note contained a Aput back@ provision that allowed Landon to satisfy the debt by tendering back
the United Medicorp, Inc. stock.  In
1992, Landon tendered his shares of United Medicorp, Inc. back to DMI in
accordance with the note provision.  The
note [provision] has been paid in full. 


 








S&H and DMI primarily
complain of the note=s
inclusion of the Aput
back@ provision and Landon=s exercise of the provision.  Landon testified that Richardson proposed a
transaction whereby the companies would invest in United Medicorp (UMC) stock
by and through their directors.  DMI
loaned Richardson $280,000.00 and Landon $70,000.00 to purchase UMC stock.  Landon testified that his note was identical
to Richardson=s note in that both notes contained the same Aput back@ provision.[8]  The Aput back@ provision reads as follows: ALender further agrees to accept this pledged
security as full and complete payment of this note.@[9]  The
note required payment to be made on or before December 31, 1991.  Landon made a voluntary partial payment on
the note in the amount of $27,369.36 in December 1990.  This payment was made at a time when the
value of UMC stock exceeded the amount at which Landon had purchased the
stock.  Landon did not make any future
payments on the note.  Instead, he
tendered his shares of the stock to DMI in March of 1992.[10]  He also obtained a reimbursement of the
$27,369.36 which he had previously paid on the note.

S&H
and DMI complain of the legal and factual sufficiency of the evidence
supporting judgment in Landon=s favor on the UMC note in Appellate Issue No. 4.   Landon asserts that the Aput back@ provision was authorized based on the purported terms of Richardson=s note and on Richardson=s oral authorization of same.  Landon=s authorization argument requires us to consider the elements required
to obtain a finding of authorization under Article 2.35-1(A)(2).  S&H and DMI argue that, unless an actual
vote of the board of directors is taken, Article 2.35-1(A)(2) cannot be invoked
to avoid the requirement of showing fairness. 
Article 2.35-1(A)(2) uses the words Avote@ and Aquorum@ to describe the actions required of the
disinterested directors.  These words
indicate that the statute requires formal board approval in order to comply
with the statute as opposed to Richardson=s informal approval.  Moreover,
the statute requires a showing that the disinterested directors acted in good
faith in approving the transaction. 
There is no evidence to the effect that Richardson acted in good faith
in approving the Aput
back@ provision. 
With respect to the fairness of the Aput back@ provision, DMI assumed all risks in the
event the value of the stock dropped. 
If the stock had risen in value, Landon would have obtained all of the
profit from the transaction.  We,
therefore, find no evidence supporting the trial court=s ruling upholding the Aput back@ provision.  The trial court=s denial of DMI=s claim on the note is reversed and remanded for a determination of the
damages which DMI is entitled to recover on said claim.  We do not address S&H and DMI=s Appellate Issues Nos. 5 & 6 because
they concern arguments presented in the alternative to their Appellate Issue
No. 4. 

                                                                 Jack
Young Note

S&H
and DMI=s Appellate Issues Nos. 8(a) and 8(b) concern
a transaction referred to by the parties as the AJack Young Note.@  The trial court entered the
following fact finding regarding the Jack Young Note:








On April 3, 1981, Jack
Young sold his shares of NCF, Inc. stock back to NCF, Inc. in exchange for a
$105,000 note.  NCF also loaned Young
$16,000.  The note provided that NCF could
offset the $16,000 from its payment due to Young.  NCF paid $25,000 to Young, leaving a balance on the note of
$80,000 that could be offset by the $16,000. 
In August 1981, Landon structured a deal with Young whereby the amount
owing on the note from NCF to Young would be postponed for four years and NCF
would deposit funds into an interest-bearing account pending resolution of
various printing bills.  On March 3,
1989, NCF loaned Young an additional $20,000 that likewise could be used to
offset the $80,000 NCF owed Young.  In
1989 Landon purchased Young=s note. 

 

On March 23, 1992, Landon
withdrew the funds earmarked for payment of the NCF note to Young.  The funds totaled $111,595.93.  Landon received the monies as payment on the
$80,000 note he had purchased from Young plus $31,595.93 of interest.  NCF was entitled to offsets of $16,000 and
$20,000 which had not been repaid.  NCF
was damaged in the amount of $36,000 on March 23, 1992, by not being afforded
the opportunity to offset the amount due it by Young plus an additional amount
of $14,218.17 in interest.[11]

 

Young
was a minority shareholder of NCF who also worked as a printing broker.   Young contracted with third-party printers
to produce the companies= mailings.  As noted in the
trial court=s fact finding, Young agreed to sell his
stock in NCF for the total sum of $105,000.00. 
NCF paid Young $25,000.00 in cash and executed a note in his favor in
the amount of $80,000.00 for a total consideration of $105,000.00.  However, NCF also loaned Young $16,000.00 at
this time with the intent of offsetting the $16,000.00 against NCF=s indebtedness on the $80,000.00 note.  NCF subsequently loaned Young an additional
$20,000.00 also with the intent of offsetting this $20,000.00 against NCF=s indebtedness on the $80,000.00 loan.  








Sometime
after the original agreement with Young was entered, it was discovered that
Young had not paid some of the printers who had been retained to do printing
for the companies even though the companies had forwarded funds to Young for
this purpose.  The concern arose that the
printers would look to the companies for payment.   Landon felt that it would be improper to pay Young=s note if Young had exposed the companies to
liability by failing to pay the printers. 
Accordingly, an agreement was reached whereby the maturity date of the
note to Young would be extended for four years to provide for the expiration of
the statute of limitations for the printers= potential claims for payment. 
Funds were placed in an escrow account at that time sufficient to pay
the $80,000 indebtedness to Young.           Landon
subsequently purchased the $80,000.00 note in favor of Young.  Landon purchased the note in his individual
capacity.  S&H and DMI contend that
Landon=s purchase of the note in his individual
capacity constituted the usurpation of a corporate opportunity.  

To
establish a breach of fiduciary duty by usurping a corporate opportunity, the
corporation must prove that an officer or director misappropriated a business
opportunity that properly belongs to the corporation.  International Bankers Life Insurance Company v. Holloway, supra
at 576-78; Icom Systems, Inc. v. Davies, 990 S.W.2d 408, 410 (Tex.App. -
Texarkana 1999, no writ).  The business
opportunity arises where a corporation has a legitimate interest or expectancy
in and the financial resources to take advantage of a particular business
opportunity.  Icom Systems, Inc. v.
Davies, supra at 410.  A corporation=s financial inability to take advantage of a
corporate opportunity is one of the defenses which may be asserted in a suit
involving an alleged appropriation of a corporate opportunity.  Canion v. Texas Cycle Supply, Inc., 537
S.W.2d 510, 513 (Tex.Civ.App. -Austin 1976, writ ref=d n.r.e.). 
A corporation=s
abandonment of a business opportunity is another defense to a suit alleging usurpation
of a corporate opportunity.  See
Huffington v. Upchurch, 532 S.W.2d 576 (Tex.1976).  The burden of pleading and proving corporate abandonment and
corporate inability is placed upon the officer or director who allegedly
appropriated the corporate opportunity. 
Huffington v. Upchurch, supra at 579; Canion v. Texas Cycle Supply,
Inc., supra at 513.








 In Appellate Issues Nos. 8(a) and 8(b),
S&H and DMI attack the trial court=s determination that Landon=s acquisition of the Jack Young Note was valid.  The opportunity to extinguish a corporation=s indebtedness to a creditor clearly
constitutes a business opportunity in which the corporation had a legitimate
interest or expectancy.   Landon urges
on appeal that Young presented this corporate opportunity to the companies but
that the companies chose not to take advantage of this opportunity.[12]  Evidence was offered that Young presented an
offer to the companies to sell stock that he owned in another corporation and
the $80,000.00 note in his favor as a package. 
However, the trial court did not find that the companies abandoned the
opportunity to re-acquire the Jack Young Note. Consequently, the trial court
did not make a finding in support of Landon=s affirmative defense of abandonment. 
The trial court=s
judgment that Landon validly acquired the Jack Young Note is, therefore, not
supported by the court=s
findings of fact.  This portion of the
trial court=s judgment is reversed and rendered in favor
of S&H and DMI.   Given the fact
that Landon purchased the Jack Young Note in a package with Young=s stock in a company, a determination of the
amount which Landon paid for the Jack Young Note is necessary.  DMI=s claim regarding the Jack Young Note is, therefore, remanded for this
determination.   DMI is entitled to
judgment against Landon for $111,595.93 less the amount which Landon paid for
the Jack Young Note.  DMI is also
entitled to prejudgment interest measured from March 23, 1992.

Landon
attacks the trial court=s determination that DMI was entitled to offsets in the amount of
$16,000.00 and $20,000.00 in Appellate Issue No. 1.  The trial court specifically found that the loans to Young had
not been paid.  Landon attacks the
evidence supporting this finding by arguing that no evidence was offered that
the loans had not been repaid.  Landon
testified at the conclusion of the trial that he thought that the loans had
been repaid by Young.  The resolution of
Landon=s evidentiary  attack depends largely on a determination of which party had the
burden of establishing the status of the loans to Young.  Landon argues that, since DMI was seeking
offsets for the loans, it had the burden of establishing that the loans
remained outstanding.   We disagree with
Landon=s contention.  DMI claimed that Landon breached his fiduciary duty in his
handling of the Jack Young Note.  As
such, Landon had the burden of proof to justify his actions with respect to the
Jack Young Note.  There is no dispute
that the sums of $16,000.00 and $20,000.00 were loaned to Young and that these
sums could be offset against NCF=s $80,000.00 indebtedness to him. 
Landon, therefore, had the burden of establishing that the $16,000.00
and $20,000.00 had been repaid.   While
Landon offered testimony that Young had repaid the loans, it was within the
province of the trial court to reject this testimony.  Landon=s
Appellate Issue No. 1 is overruled.

                                                        Landon=s $100,000.00 Note

 In their Appellate Issues Nos. 9(a) and 9(b),
S&H and DMI attack the trial court=s judgment in Landon=s favor regarding a loan of $100,000.00 that he made to at least one of
the companies.  The trial court entered
the following findings of fact regarding the loan:

On or
about September 11, 1995, Carl Landon lent $100,000 to S&H Marketing and
DMI pursuant to the terms of a promissory note.  On or about December 13, 1995, S&H paid Landon $5,000 as a
reduction of principal on the note.  The
note provided for 18% interest and was due upon demand but not later than December
11, 1995.  As of December 13, 1995,
$95,000 remained due on the note. 
Landon is entitled to recover $95,000 plus interest at 18% per annum and
reasonable attorney=s
fees.

 








The
evidence revealed that the loan occurred as a result of a need to pay an
invoice for electronic equipment which S&H had ordered.  Landon testified that he discussed the
companies= inability to pay the invoice with Richardson
and that Richardson advised him to find a way to take care of the
shortfall.  Landon responded by making
the $100,000.00 loan from his personal funds. 
Landon was the only corporate officer to approve the note which was
executed. There is no dispute that Landon made a loan of $100,000.00 to
S&H.  However, S&H and DMI
complain of the interest rate which Landon charged on the loan.  DMI additionally asserts that Landon
breached his fiduciary duty by including it as a maker on the note.  

Landon
testified that he wired $100,000.00 into S&H=s operating account to cover the invoice for S&H.  Landon unilaterally prepared the note a few
days after the loan was made.  With
respect to the note=s
interest rate, Landon testified that he Acharged them an extremely high interest rate for a B what I thought was going to be a 90-day term
note here.@  He
further testified that Richardson and Lippman protested the interest rate as
being extremely high.  With respect to
DMI=s inclusion on the note, Landon was asked at
trial:  

Q:  As I understand it, the money was
transferred into the S&H operating account and DMI got none of the proceeds
of that loan.  Correct? 

 

A:  That=s correct.

 

Landon testified that he
included DMI as the maker on the note and pledged assets owned by DMI to ensure
repayment of his loan.  He was concerned
about repayment based upon Richardson filing for bankruptcy a few weeks prior
to the loan.  The trial court did not
make any findings that the board authorized the terms of the note or that the
note=s terms were fair.  Even if the trial court had made these findings, there is no
evidence in the record to support these findings.  Landon=s
unilateral preparation of the note occurred at a time when the boards of
directors of S&H and DMI were comprised of Richardson, Landon, Lippman, and
Sullivan.  The evidence conclusively
establishes that a majority of disinterested directors did not authorize the
terms of the note.  With respect to
fairness, the evidence clearly establishes that DMI did not receive any
proceeds of the loan but, rather, that the loan was used to fund S&H=s purchase of inventory.    As for the interest rate, Landon testified
that the rate was extremely high.  








Landon
argues on appeal that Richardson ratified the terms of the loan by not
protesting the terms after being advised of same.  The trial court did not find that ratification occurred.  Furthermore, Richardson did not constitute a
majority of disinterested directors, and he did not possess, own, or control
the stock of either S&H or DMI at the time the alleged ratification
occurred.              We, therefore, reverse the trial court=s judgment against DMI on Landon=s $100,000.00 note and render judgment in DMI=s favor in that regard.  With respect to the interest rate, we
reverse the trial court=s judgment providing for interest against S&H at the rate of 18
percent per annum.  With respect to the
further disposition of the interest issue, S&H contends that we should make
a usury finding against Landon and impose the penalties set out in the usury
statutes.   S&H argues that, since
the board of directors did not authorize a specified interest rate, Landon was
limited to charging the Alegal interest rate@ set out in TEX. FIN. CODE ANN. ' 302.002 (Vernon Supp. 2002) of 6 percent for situations wherein no
interest rate is agreed upon by the parties. 
It does not appear that S&H=s usury claim was adequately developed in the trial court.  We, therefore, remand the interest issue to
the trial court for a determination of the interest rate which Landon would be
permitted to charge under the fairness requirement for interested
officer/director transactions.  With
respect to S&H=s
usury claim, we would direct the parties attention to a provision of Landon=s note which reads:  ANothing in this note shall authorize the
collection of interest in excess of the highest rate allowed by law.@  It
would appear that this provision constitutes a savings provision which could
affect the usury claim.

                                                                  Travel
Expenses

S&H
and DMI=s Appellate Issue No. 10 addresses a judgment
against DMI in the amount of $1,570.00 for the reimbursement of Landon=s travel expenses.  The trial court found that the expenses were incurred by Landon Aon behalf of and for the benefit of S&H
and DMI.@ 
S&H and DMI do not contest the judgment for travel expenses entered
against S&H.  However, they contend
that there is legally and factually insufficient evidence to support the
finding that the expenses were incurred on behalf of DMI.  They assert that, since DMI was dormant at
the time the travel occurred, the expenses were not incurred for the benefit of
DMI.  We disagree with S&H and DMI=s assertion. 
While DMI may not have been actively engaged in sending mail
solicitations, DMI continued to remain an existing entity operated in
conjunction with the other companies. 
Unlike Landon=s loan
of $100,000.00 which solely benefitted S&H, the travel expenses are not
clearly attributable to a single company. 
We, therefore, find legally and factually sufficient evidence to support
the trial court=s determination.  S&H and DMI=s Appellate Issue No. 10 is overruled. 


 








                                                               UCNWINN
Stock

 In their Appellate Issue No. 11, S&H and
DMI attack the legal and factual sufficiency of the trial court=s finding that Landon is entitled to keep
stock in a company referred to as AUCNWINN.@  The
testimony revealed that NCF owned stock in a company known as ASOK Properties.@  Landon purchased this stock from
NCF in 1992 for $10.00.  Landon
testified that the stock had little or no value.  He further testified that the transfer was made to dispose of NCF=s assets in light of a creditor=s impending effort to seize its assets.   Subsequent to Landon=s purchase, SOK was acquired by UCNWINN.  S&H and DMI concede that there is some
evidence that Landon=s
purchase was authorized.  However, they
emphasize that conflicting evidence outweighs the evidence of
authorization.  We find legally and
factually sufficient evidence supporting the trial court=s determination that Landon is permitted to
keep the UCNWINN stock.  The transaction
was consistent with other transactions undertaken by NCF to eliminate assets
upon which its creditor could execute by judgment.  S&H and DMI=s Appellate Issue No. 11 is overruled.

                                                                        Postage


Landon
argues in his fourth appellate issue that the evidence either conclusively
established his claim to be reimbursed for postage in the amount of $38,560.00
or that the trial court=s denial of his claim was against the great weight and preponderance of
the evidence.  The trial court entered
the following finding with respect to this claim:

Landon
charged $38,560 for postage on various credit cards.  Landon introduced insufficient evidence at trial showing that the
postage was used for the benefit of DMI or S&H Marketing.  The Court finds therefore that the postage
was not used for the benefit of either DMI or S&H Marketing.  Neither S&H Marketing or DMI are liable
to Landon on his postage claim.

 

As per the trial court=s finding, Landon testified that postage in
the amount of $38,560.00 was charged to his credit card on behalf of the
companies.  Landon bore the burden of
proof on this claim for affirmative relief. 
It was within the province of the trial court to reject Landon=s testimony in support of this claim.  Landon=s Appellate Issue No. 4 is overruled.

                                                   Phillipsburg
Twelve-Station Inserter








Landon=s Appellate Issue No. 5 concerns the trial
court=s calculation of damages awarded to
Mailmasters, S&H=s
wholly-owned subsidiary, regarding a piece of mail equipment referred to as a APhillipsburg Twelve-Station Inserter@ which Landon purchased individually and
leased to Mailmasters.[13]  The trial court=s findings regarding this transaction were as
follows:

In October
1988, Landon purchased a Phillipsburg Twelve-Station Inserter from Bell &
Howell.  Mailmasters made a down payment
of $9,112.  In January 1989, Landon
began leasing the Phillipsburg to Mailmasters. 
The equipment lease required payments through 1993 at which time the
lease expired and Mailmasters had an option to purchase the equipment for
$10,000.  (After offsetting the $9,112
that Mailmasters had paid down, Mailmasters would owe $888 if it chose to
exercise the option.)  Rather than
exercising the option to purchase, Landon instructed Julie Beck to continue
making the annual lease payments of $17,661 each or $35,322.  Landon is liable to Mailmasters for the
$35,322.  Additionally, Landon has no
possessory or ownership interest in the Phillipsburg Twelve-Station
Inserter.  

 

The trial court entered
judgment against Landon for the principal amount of $35,322.00.  Landon first argues that the amount of $35,322.00
should have been reduced by $888.00 because Mailmasters would have owed this
amount under the lease had it exercised the option.  We find that Landon=s contention is consistent with the trial court=s finding that $888 would have been owed. 

Landon
also contends that the trial court incorrectly calculated prejudgment interest
on the award of damages regarding the inserter.  The trial court=s judgment provides that prejudgment interest is to be calculated from
the dates of June 30, 1994, and June 30, 1995, for each of the payments of
$17,661.00 made by Mailmasters.   These
payments represented the due dates for future payments under the lease.  Landon argues that Mailmasters did not make
payments on the dates of June 30, 1994, and June 30, 1995, but, rather, that
the payments were made on September 13, 1994, and July 27, 1995,
respectively.  He, therefore, argues
that prejudgment interest should have been calculated from September 13, 1994,
and July 27, 1995.  Given the fact that
Mailmasters had use of the funds until the date the payments were actually
made, we find Landon=s
contention well taken.








We, therefore, modify the
trial court=s judgment awarding Mailmasters $35,322.00 to
reflect an award of $34,434.00.  We
further modify the trial court=s calculation of prejudgment interest. 
Mailmasters is entitled to prejudgment interest on the sum of $16,773.00
measured from September 13, 1994, until March 23, 2000, at the rate of 10
percent.  Mailmasters is entitled to
prejudgment interest on the sum of $17,661.00 measured from July 27, 1995,
until March 23, 2000.

Finally,
Mailmasters attempts to assert an appellate issue in this proceeding although
it did not file a notice of appeal. 
TEX.R.APP.P. 25.1(c) provides that A[t]he appellate court may not grant a party who does not file a notice
of appeal more favorable relief than did the trial court except for just cause.@  This
appellate issue appears in the appellees= brief filed in this matter by S&H and DMI in response to Landon=s appellant=s brief.[14]   The appellate issue is referred to as a Across-issue.@  However, the issue seeks
affirmative relief by requesting the award of $9,112.00 in connection with a
payment it purportedly made with respect to the inserter.  Mailmasters argues that it should be
permitted to assert this appellate issue on the basis that Landon did not list
Mailmasters as an appellee on the docketing statement which he filed in this
cause.  We disagree with Mailmasters= reasoning. 
Mailmasters=
omission from Landon=s
docketing statement would only justify permitting Mailmasters to present a
defensive matter to an appellate complaint made by Landon.  The appellate issue which Mailmasters
attempts to assert is a claim for affirmative relief seeking additional damages
other than those awarded by the trial court. 
Mailmasters knew or should have known of this complaint at the time the
trial court entered its judgment.  We,
therefore, decline Mailmasters= request to address its appellate issue. 

                                                                      Conclusion








The trial
court=s judgment on S&H and DMI=s claims concerning bonuses paid to Landon is
affirmed.  With respect to the Grand
Prairie Property, the trial court=s determination that the terms of the real estate lien note were
modified is reversed and rendered in favor of DMI.  The issue of the damages which DMI is entitled to recover for
Landon=s breach of the real estate lien note is
remanded for determination.   The trial
court=s denial of DMI=s claim on the United Medicorp Note is reversed and remanded for a
determination of the damages which DMI is entitled to recover on said
claim.  The trial court=s determination that Landon=s acquisition of the Jack Young Note was
valid is reversed and rendered in favor of S&H and DMI.  DMI=s claim for damages regarding the Jack Young Note is remanded for a
determination of the amount which Landon paid for the note so that DMI=s damages can be calculated.  The trial court=s determination that DMI  is entitled to offsets for Young=s notes of $16,000.00 and $20,000.00 is
affirmed.  The judgment against DMI on
Landon=s $100,000.00 note is reversed and rendered
in DMI=s favor. 
The judgment sustaining the interest rate of 18 percent on Landon=s $100,000.00 note is reversed and remanded
for determination consistent with this opinion.  The trial court=s judgment pertaining to Landon=s travel expenses, the UCNWINN stock, and Landon=s postage claim is affirmed.  The trial court=s damage award regarding the Phillipsburg
Twelve-Station Inserter is modified and affirmed consistent with this
opinion.  

 

W. G.
ARNOT, III

CHIEF
JUSTICE

 

June 13, 2002

Publish.  See TEX.R.APP.P. 47.3(b).

Panel consists of: Arnot, C.J., and

Wright, J., and McCall, J.











     [1]Landon served on the board of directors of NCF from
1987 to 1989.  





     [2]All claims which NCF could have asserted against Landon
were assigned to and prosecuted by DMI. 






     [3]Response Marketing, Inc. (RMI) was another direct mail
marketing business which NCF acquired after S&H and DMI were
purchased.    RMI was operated as a sister
company to S&H and DMI.  Landon
served as the president of RMI, and he and Richardson  comprised the membership of its board of directors.  RMI=s
claims against Landon were assigned to DMI.





     [4]The supreme court in Dow Chemical Company cited
Sterner v. Marathon Oil Company, 767 S.W.2d 686 (Tex.1989), in commenting on
the standard of review for a Amatter of law@ challenge.  We
note that Sterner and Holley v. Watts, 629 S.W.2d 694 (Tex.1982), are
often cited for the proposition that a Amatter
of law@ challenge requires a two-step analysis of the
evidence.  The first step requires a
review of the record to find evidence which supports the fact finder=s failure to make the affirmative finding sought by the
claimant.  If there is no evidence to
support the fact finder=s Ano@ finding, the second step requires an examination to
see if the contrary proposition, i.e. 
the affirmative finding which the claimant sought to obtain, is
established as a matter of law.  We
believe that Sterner=s and Holley=s formulation
of the applicable standard of review is both illogical and incorrect.  The problem with their standard was
addressed by the  El Paso Court of
Appeals in Montes v. Texas Employers=
Insurance Association, 779 S.W.2d 485, 487 (Tex.App. - El Paso 1989, writ den=d), wherein the court stated:

 

We
respectfully question that analysis of the issue because in applying the first
half of that rule, it must be recognized that no evidence is required to
support a "no" answer, which only means that the party with the
burden of proof failed to carry that burden. 
If that be so, and it clearly is, then a reviewing court would never get
to the second hurdle.   In addition, we
note that the "no" answer is not a finding of the opposite of the
issue inquired about.  If there is no
finding of the "opposite" how does a court determine if there is some
evidence to support the finding?   No
finding has been made.   We conclude
there is only one hurdle. Does a review of the entire record establish the
proposition as a matter of law?   If
that question is answered in the affirmative, it must necessarily mean that the
jury answer was wrong and the jury could not legally have answered the question
in the negative.  

 

If there is
any evidence to the contrary, the issue has not been established as a matter of
law.  (Citations omitted) 

 

We believe
that Montes= criticism of Sterner and Holley is
well-founded.  Furthermore, we
enthusiastically support the supreme court=s
tacit abandonment of the two-step analysis in Dow Chemical Company.





     [5]S&H and DMI=s
Appellate Issue No. 12(b) addresses the trial court=s failure to enter findings to the effect that the
statute of limitations were tolled on other claims they asserted.   The trial court did not deny these other
claims on limitations grounds.  Accordingly,
we do not address Appellate Issue No. 12(b) because it is moot.





     [6]As of 1993, Lippman possessed the voting rights of the
entire stock of DMI.





     [7]Landon argues that his execution of the modification
agreement did not constitute an interested transaction.  Given the fact that Landon=s execution of the modification agreement eliminated
his personal liability on the real estate lien note, we disagree with his
assertion. 





     [8]Richardson=s
note was not offered into evidence.





     [9]Even though the note purports to contain a provision
binding DMI, no one executed the note on behalf of DMI.   





     [10]The UMC stock was worth less than $10,000.00 when
Landon tendered it to DMI.





     [11]The trial court=s
references to 1981 are erroneous.  The
Jack Young Note was executed in 1987.





     [12]Landon did not plead abandonment in the trial court.





     [13]Mailmasters asserted that Landon=s purchase of the inserter in his individual capacity
and subsequent lease of same to the company constituted the usurpation of a
corporate opportunity.  The trial court
denied Mailmasters= claim in this regard which Mailmasters does not
appeal.





     [14]Mailmasters=
name appears on the cover of the brief.